RECEIVED

JUL 0 1 2015

MICHAEL T. MASON
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JUDGE SHAH

UNITED STATES OF AMERICA                  )

　　　v.                                           )

MAGISTRATE JUDGE VALDEZ

No. **15 CR 399**

VINCE MANGLARDI,                          )
THEODORE J. WOJTAS, JR.,                   )
　　　also known as "T.J. Wojtas,"            )
WALTER VALI,                              )
　　　also known as "Wally Mohammad"         )
　　　and "Mohammad Valimohammad,"          )
DAVID W. BELCONIS,                        )
NUNZIO L. GRIECO, and                     )
KARIN L. GANSER                           )

<u>Violations</u>: Title 18,
United States Code,
Sections 1014, 1341,
and 1343

**FILED**

JUL 0 1 2015

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

<u>**COUNT ONE**</u>
**(Wire Fraud)**

The SPECIAL SEPTEMBER 2014 GRAND JURY charges:

1.　　At times relevant to this indictment:

**<u>The Woods at Countryside</u>**

　　a.　　The Woods at Countryside was a residential development consisting of approximately 719 apartments, spread over 50 acres of land in Palatine, Illinois.

　　b.　　In or about 2006, a group of real estate developers—namely, defendant VINCE MANGLARDI, defendant THEODORE J. WOJTAS, JR. (also known as "T.J. Wojtas"), and a business partner—purchased the Woods and converted the apartments to condominiums for sale to the general public.

　　c.　　The developers financed their property acquisition and condo conversion with loans from two commercial lenders, Parkway Bank & Trust

Company and Puritan Financial Corporation, in an amount totaling approximately $73,000,000.

        d.     To facilitate the sale of the condos, MANGLARDI and WOJTAS invited mortgage loan originators onto the property to meet with potential condo buyers and to assist them in applying for mortgage loans.

        e.     During the period between about 2007 and 2009, over 250 mortgage loans totaling more than $32,000,000 were originated on behalf of condo buyers at the Woods.

        f.     Among the lenders that funded those mortgage loans were FDIC-insured financial institutions such as Bank of America, BankUnited, Countrywide Bank, Flagstar Bank, Inland Bank & Trust, JP Morgan Chase Bank, Lehman Brothers Bank, Washington Mutual Bank, and Wells Fargo Bank, and mortgage lending businesses such as ABN AMRO Mortgage Group, Inc., American Mortgage Network, Inc., American United Mortgage, A & N Mortgage Services, Inc., Bancgroup Mortgage Corporation, Chicago Bancorp, Inc., CitiMortgage, Inc., Fifth Third Mortgage Company, Interbank Mortgage Company, National City Mortgage, Suntrust Mortgage, Inc., and Wachovia Mortgage Corporation.

### The Secondary Mortgage Market

        g.     The Federal National Mortgage Association, commonly known as "Fannie Mae," and the Federal Home Loan Mortgage Corporation, commonly known as "Freddie Mac," were government-sponsored enterprises that created and expanded a secondary mortgage market.

h.      In the secondary mortgage market, Fannie Mae and Freddie Mac purchased mortgage loans from banks and mortgage lenders, thereby enabling such banks and mortgage lenders to raise capital to fund new loans to more customers.

i.      Fannie Mae and Freddie Mac set guidelines for the types of loans eligible to be sold in the secondary mortgage market. The guidelines for eligible (or "conforming") loans required lenders to make certain representations and warranties regarding the following details, among others:

- the purpose of the loan, more specifically, whether the borrower used the loan to purchase a residence or an investment property;

- the dollar amount of the loan in comparison to the dollar value of the property securing the loan (loan-to-value ratio);

- seller concessions or incentives, that is, financial incentives given by the property seller to the buyer, such as a reduction in the sales price, a down payment refund, or the payment of costs normally required to be paid by the buyer;

- any other mortgage loans which the same buyer was obligated to pay on other investment properties; and

- with regard to condo developments, the total number of condos under contract and the total number of condos sold.

j.      Between about 2007 and 2009, Fannie Mae and Freddie Mac purchased over $32,000,000 in mortgage loans that had been made to buyers of condos at the Woods. Fannie Mae and Freddie Mac purchased such loans based on lenders' representations and warranties that the loans were conforming loans.

3

## The Defendants

k.     MANGLARDI and WOJTAS managed and controlled all aspects of the affairs of the Woods and the sale of condos within the Woods. MANGLARDI and WOJTAS managed the affairs of the Woods through a variety of corporate entities and alter egos, including:

- American Dream, Inc.;
- Countryside Real Estate Development, LLC;
- ESP 411 Holdings, LLC;
- Palatine Leasing Services Group, Inc.;
- Renaissance Residential of Countryside, LLC;
- Renaissance Residential Property Management, Inc.; and
- Steal-A-Condo, LLC.

l.     Defendant WALTER VALI, also known as "Wally Mohammad" and "Mohammad Valimohammad," was a mortgage loan originator, doing business under the name of Sunshine Funding, Inc., a mortgage brokerage located in Mundelein, Illinois. Sunshine Funding entered into broker agreements with mortgage lending institutions to originate and sell mortgage loans to such institutions in accord with applicable lending guidelines and requirements.

m.     Defendant DAVID W. BELCONIS was an attorney licensed to practice law in the State of Illinois. BELCONIS also owned and operated a title insurance company known as Classic Title, LLC.

n.     Defendant NUNZIO L. GRIECO was the director of contract administration at the Woods, responsible for, among other things, preparing sales contracts for condo buyers and filling out condominium project questionnaires and homeowner's association questionnaires for mortgage loan officers and brokers.

4

o.    Defendant KARIN L. GANSER was a real estate salesperson licensed by the State of Illinois, and employed as a condo sales agent at the Woods. GANSER also purchased multiple condos at the Woods as an investor.

### The Fraud Scheme

2.    From in or about 2007 until in or about 2009, at Palatine, in the Northern District of Illinois, Eastern Division, and elsewhere,

> VINCE MANGLARDI,
> THEODORE J. WOJTAS, JR.,
>     also known as "T.J. Wojtas,"
> WALTER VALI,
>     also known as "Wally Mohammad"
>     and "Mohammad Valimohammad,"
> DAVID W. BELCONIS,
> NUNZIO L. GRIECO, and
> KARIN L. GANSER,

defendants herein, together with others known and unknown, devised, intended to devise, and participated in a scheme to defraud condo buyers and borrowers, banks and mortgage lenders, and Fannie Mae and Freddie Mac, and to obtain money from them by means of materially false and fraudulent pretenses, representations, and promises, and concealment of material facts, which scheme affected financial institutions.  More specifically, the defendants colluded with each other and with others to induce people to purchase condos at the Woods based on false promises and assurances.  The defendants further colluded with one another and with others to misrepresent and conceal material facts from banks and mortgage lenders in order to fraudulently induce such banks and mortgage lenders to approve non-

5

conforming loans to condo buyers, thereby exposing numerous lenders and Fannie Mae and Freddie Mac to millions of dollars in losses.

3. As described in more detail below, the defendants and their co-schemers carried out the fraud scheme through various methods and means, including, but not limited to:

a. using an assortment of advertising methods and sales pitches—on air, online, in writing, and at live presentations—to falsely promote the purchase of condos at the Woods as a means to financial independence and wealth, enticing prospective condo buyers with substantial, unsustainable financial incentives, in particular, down payment refunds and up to three years' worth of mortgage payments, maintenance costs, and property tax payments;

b. using boilerplate condominium sales contracts which did not document the financial incentives provided to condo buyers;

c. inflating statistics as to the number of condos under contract and sold, in order to fraudulently induce lenders to approve mortgage loans to prospective condo buyers;

d. submitting false and fraudulent sales contracts, condominium questionnaires, mortgage loan applications, and related closing documents to mortgage lenders, thereby fraudulently inducing the lenders to approve non-conforming loans and to disburse millions of dollars in loan proceeds to unqualified borrowers; and

e. using corporate entities and shell companies, including American Dream, Inc., ESP 411 Holdings, LLC, and Palatine Leasing Services Group, Inc., to conceal from mortgage lenders that they were making down payments and mortgage payments on behalf of condo buyers.

## A.    *False Advertising*

4.    It was part of the scheme that MANGLARDI and WOJTAS falsely promoted investments in condos at the Woods as a means to financial independence and wealth, with little or no risk.  MANGLARDI and WOJTAS used written, electronic, and live media—including the radio, the Internet, billboards, brochures and other written marketing materials, and live presentations at hotels and banquet halls—to market their condos to the general public.

5.    It was further part of the scheme that MANGLARDI and WOJTAS made materially false promises, guarantees, and representations in their marketing materials and sales pitches, including that:

a. condo buyers would receive "guaranteed" monthly payments covering their mortgages, condo assessments, and property taxes for a two- or three-year period of time—payments which MANGLARDI and WOJTAS knew to be unsustainable because (i) they were collecting less money in rental income than what they were committing to pay to condo buyers pursuant to their purported investment programs, and (ii) they had their own substantial, unsatisfied commercial loan obligations to Parkway Bank and Puritan Financial; and

b.    their investment programs were backed by a private fund of money, known as the "American Freedom Fund" or the "Buyers Equity Fund," represented at various times to be a multi-million-dollar fund, a $100-million-dollar fund, or a multi-billion-dollar fund, which, as MANGLARDI and WOJTAS knew, did not exist.

6.    It was further part of the scheme that WOJTAS touted himself, in written materials and online, as the developer and CEO of the Buyers Equity Fund, falsely representing on the Fund's website that "[w]e are a multi-billion dollar fund that is set up to put money in the hands of homeowners," that "we take all the risk of their home ownership," and that "[w]e are big enough and have deep enough pockets that we can handle the risk," when in fact, as WOJTAS knew, he and MANGLARDI would not be taking all of the risk of each investor's condo ownership and they were not big enough and did not have deep enough pockets to handle the risk.

7.    It was further part of the scheme that MANGLARDI, WOJTAS, and their co-schemers solicited and induced potential buyers to purchase multiple condos, regardless of their financial ability to pay for them, based on promises and assurances of down payment refunds and the payment of all property costs— including monthly mortgage payments, condo assessments, maintenance, and property taxes—for a guaranteed two- or three-year period of time.

**B.      *False Sales Contracts***

8.      It was further part of the scheme that MANGLARDI, WOJTAS, and their co-schemers did not document their promises, representations, and financial inducements in condominium sales contracts that they provided and caused to be provided to condo buyers at the Woods.

9.      It was further part of the scheme that MANGLARDI, WOJTAS, and their co-schemers systematically prepared and used false and fraudulent sales contracts, and caused false and fraudulent sales contracts to be prepared and used, in connection with the sale of condos at the Woods.    More specifically, MANGLARDI, WOJTAS, and their co-schemers used boilerplate sales contracts, labeled "Condominium Purchase and Sale Agreements," along with "Incentive Riders," which misrepresented and omitted the following material facts:

a.      that the stated condo prices did not reflect their intention to front and refund buyers' down payments, which would effectively reduce the prices of those condos;

b.      that they intended to make mortgage payments and pay property taxes and condo assessments on behalf of condo buyers, which would serve to further reduce the condo prices stated in the contracts; and

c.      that they would be obtaining possessory and equity interests in the condos in exchange for the financial inducements and concessions made to condo buyers.

10.     It was further part of the scheme that by omitting those material terms from their sales contracts and incentive riders, MANGLARDI, WOJTAS, and their co-schemers intended to conceal from banks and mortgage lenders, and to cause to be concealed from banks and mortgage lenders, the true nature of the agreements between the parties, the intentions of the contracting parties, and the true sales prices and values of the underlying condos.

## C.     *Inflated Sales Statistics*

11.     It was further part of the scheme that GRIECO intentionally falsified statistics regarding the number of condos under contract and sold at the Woods. GRIECO falsified condo sales figures in several ways, including:

a.      by filling out lenders' condominium project questionnaires in which he falsely represented that more than 50% of the condos at the Woods had been sold, when in fact, as he knew, less than 50% of the condos had been sold;

b.      by filling out homeowner's association questionnaires and certifications in which he falsely represented that more than 50% of the condos at the Woods had been sold, when in fact, as he knew, less than 50% of the condos had been sold; and

c.      by verbally providing inflated sales numbers to appraisers, knowing that the appraisers would include those inflated sales numbers in their written appraisal reports to banks and mortgage lenders.

12.     It was further part of the scheme that by falsifying and inflating sales statistics in condominium project questionnaires and homeowner's association

questionnaires, GRIECO knowingly misled banks and mortgage lenders into believing that the Woods satisfied the project eligibility guidelines of Fannie Mae and Freddie Mac and, therefore, that any mortgages originated at the Woods would be eligible for resale in the secondary mortgage market. In reality, the Woods did not satisfy the project eligibility guidelines of Fannie Mae and Freddie Mac because less than 50% of the condos had been sold and, therefore, any mortgages originated at the Woods were not eligible for resale in the secondary mortgage market.

**D.   *False Loan Applications and Closing Documents***

13.   It was further part of the scheme that MANGLARDI and WOJTAS referred prospective condo buyers to mortgage loan originators, including VALI, to assist the buyers in fraudulently applying for mortgage loans.

14.   It was further part of the scheme that VALI and other mortgage loan originators prepared false and fraudulent mortgage loan applications on behalf of condo buyers. VALI and other mortgage loan originators prepared mortgage loan applications that were materially false and fraudulent in one or more respects, including that:

a.   they falsely stated that the condos would be used as the buyers' primary residences;

b.   they misrepresented and omitted the true source of the buyers' down payments;

c.   they misrepresented the buyers' employment, income, and assets; and

    d.    they omitted material liabilities of the buyers, in particular, other mortgage loans for which the buyers would be obligated to pay.

15.    It was further part of the scheme that MANGLARDI, WOJTAS, VALI, and their co-schemers submitted to banks and mortgage lenders, and caused to be submitted to banks and mortgage lenders, false and fraudulent mortgage loan applications, together with false and fraudulent supporting documents—such as (a) sales contracts and incentive riders which omitted material facts, as described in paragraphs 8-10 above; (b) condo questionnaires, homeowner's association questionnaires, and appraisal reports containing inflated sales statistics, as described in paragraphs 11-12 above; and (c) fabricated documents which inflated loan applicants' income and assets—all for the purpose of fraudulently inducing banks and mortgage lenders to approve non-conforming loans to unqualified borrowers and then to disburse millions of dollars in loan proceeds at closings for the sale of condos at the Woods.

16.    It was further part of the scheme that MANGLARDI and WOJTAS referred prospective condo buyers to a certain real estate attorney, namely, BELCONIS. MANGLARDI and WOJTAS also referred closings to BELCONIS's title insurance company, Classic Title, LLC, to assist them in closing fraudulent condo deals, including deals involving family members, friends, and associates, such as GANSER, GANSER's daughter, and MANGLARDI's wife and daughter.

## Fraudulent Deals Involving GANSER

17.     It was further part of the scheme that GANSER acquired twelve condos at the Woods, which she financed with fraudulently-obtained mortgage loans.   GANSER acquired those twelve condos in the span of less than three months, despite the fact that she did not have the financial resources with which to make the required down payments and prospective mortgage payments, or the intent to make the down payments and pay the mortgages with her own money.

18.     It was further part of the scheme that GANSER fraudulently induced banks and mortgage lenders to approve twelve mortgage loans by causing false and fraudulent mortgage loan applications to be submitted to them.   GANSER's loan applications were materially false and fraudulent in one or more respects, including that:

a.     the source of her down payments, American Dream, was misrepresented and omitted;

b.     her assets were inflated; and

c.     material liabilities of hers—in particular, other mortgage loans for which she would be responsible—were omitted.

19.     It was further part of the scheme that GANSER fraudulently inflated her bank account balances by depositing checks from American Dream.   After inflating her account balances to mislead lenders, GANSER returned the funds to American Dream by writing checks on her bank account payable to American Dream.

13

20.     It was further part of the scheme that GANSER knowingly submitted fraudulent documents in support of her mortgage loan applications, including a fraudulent check stub from American Dream reflecting an $80,000 payment to GANSER for "consulting services" which GANSER allegedly provided to American Dream (money which GANSER used to temporarily inflate her bank account balance and which she then repaid to American Dream); a check stub from American Dream reflecting a $62,345 payment to GANSER for a "commission" allegedly earned by GANSER, together with a copy of a check in that amount from American Dream to GANSER (a check which GANSER never deposited or cashed); and fabricated apartment leases purporting to show that GANSER was receiving certain amounts of rental income from rental properties that she owned.  GANSER knew that the fabricated leases bore forged signatures of GANSER's tenants and inflated the amount of GANSER's actual monthly rental income, so that GANSER could mislead lenders into believing that she would have sufficient monthly income to pay the mortgages for which she was applying.

21.     It was further part of the scheme that GANSER signed false, misleading, and fraudulent documents at the condo closings, including false loan applications and misleading settlement statements attesting that she had tendered certain sums of cash toward the purchase of the condos, when in fact American Dream funded her down payments.

22.     It was further part of the scheme that GANSER gave BELCONIS a power of attorney to sign documents on her behalf at two fraudulent closings which

she did not attend. On GANSER's behalf, BELCONIS knowingly signed false, misleading, and fraudulent closing documents, including settlement statements falsely attesting that GANSER had tendered quantities of cash toward the purchases of the condos, when in fact, as BELCONIS knew: (a) American Dream was the source of the down payments (via wire transfers of funds from American Dream's bank account to the escrow account of the closing settlement agent); and (b) American Dream would be fraudulently reimbursed—from the proceeds of the fraudulently-obtained mortgage loans—for having made those down payments.

### Fraudulent Deals Involving GANSER's Daughter

23.    It was further part of the scheme that MANGLARDI and GANSER set up three fraudulent condo deals under the name of GANSER's daughter.

24.    It was further part of the scheme that GRIECO and GANSER prepared three fraudulent sales contracts on behalf of GANSER's daughter.

25.    It was further part of the scheme that MANGLARDI and GANSER caused the signature of GANSER's daughter to be forged on fraudulent sales contracts and mortgage loan application documents in connection with each of the three fraudulent condo deals. MANGLARDI and GANSER fraudulently used the name and identity of GANSER's daughter, knowing that she had no intention to make any mortgage payments and that she did not have the financial ability to pay all of the mortgages, condo assessments, and property taxes that would be owed on the three condos to be titled in her name.

15

26.     It was further part of the scheme that MANGLARDI and GANSER caused the fraudulent sales contracts and mortgage loan application documents to be submitted to mortgage lenders to finance those three fraudulent condo deals.

27.     It was further part of the scheme that MANGLARDI, BELCONIS, and GANSER arranged for the three fraudulent closings to take place at the offices of BELCONIS's title insurance company, Classic Title, where the signature of GANSER's daughter was forged on multiple mortgage loan documents and closing documents.

28.     It was further part of the scheme that BELCONIS, a notary public, falsely notarized mortgages and closing documents bearing the forged signature of GANSER's daughter.     Among the closing documents falsely notarized by BELCONIS were false occupancy affidavits designed to mislead lenders into believing that GANSER's daughter intended to occupy each of the three condos as a primary residence, despite the fact that GANSER's daughter maintained a primary residence elsewhere, had no intention of moving and using any of the three condos as her primary residence, and could not have conceivably used all three condos as a primary residence in any event.     In falsely notarizing mortgages, occupancy affidavits, and other closing documents, BELCONIS falsely attested that such documents bore the genuine signature of GANSER's daughter, when in fact they did not, and that GANSER's daughter signed the documents in his presence, when in fact she did not.

29.     It was further part of the scheme that MANGLARDI, BELCONIS, and GANSER thereby fraudulently induced three different mortgage lenders to disburse mortgage loan proceeds to Classic Title to fund the three fraudulent condos deals in the name of GANSER's daughter.

30.     It was further part of the scheme that MANGLARDI, WOJTAS, BELCONIS, and GANSER caused Classic Title to disburse proceeds of the fraudulently-obtained mortgage loans to Palatine Leasing Services Group, Inc. and to American Dream, Inc., entities controlled by MANGLARDI and WOJTAS.

31.     It was further part of the scheme that MANGLARDI used American Dream and another entity that he controlled, namely, B4V, LLC, to divert to GANSER proceeds of those three fraudulent condo deals.  MANGLARDI made fraudulent payments to GANSER after each of the three fraudulent closings, with checks written on the accounts of American Dream and B4V.

**Fraudulent Deals Involving MANGLARDI's Wife and Daughter**

32.     It was further part of the scheme that MANGLARDI involved his wife and daughter in ten fraudulent condo deals.  Of those ten condos:

a.     MANGLARDI arranged to sell six condos to his wife—two of the condos to purportedly serve as her primary residence, at a time when she maintained a primary residence elsewhere with MANGLARDI—knowing that she had no intention and ability to make all of the down payments, mortgage payments, condo assessments, and property tax payments that would be owed on the condos.

b.     MANGLARDI arranged to sell four condos to his daughter—all four condos purportedly to serve as her primary residence, at a time when she was a full-time college student in Florida—knowing that she had no intention and ability to make all of the down payments, mortgage payments, condo assessments, and property tax payments that would be owed on the condos.

33.     It was further part of the scheme that MANGLARDI sought to mislead lenders into believing that his daughter was an employee of a property management company (Company A), earning sufficient wages to purchase a condo and repay a mortgage loan, when in fact she was a full-time college student not earning sufficient wages to afford a mortgage loan. MANGLARDI did so by requesting a company employee (Individual A) to misrepresent to lenders that MANGLARDI's daughter was employed by Company A when contacted by lenders seeking to verify her employment and earnings. Individual A followed MANGLARDI's instructions, falsely verified that MANGLARDI's daughter was employed at Company A, and created fake pay stubs reflecting that MANGLARDI's daughter had earned a certain amount of income from Company A.

34.     It was further part of the scheme that MANGLARDI requested Individual A to falsely verify to one or more other lenders that MANGLARDI's daughter was employed by another entity, namely, B4V, LLC, and to create a false pay stub reflecting his daughter's supposed earnings from B4V, LLC.

35. It was further part of the scheme that MANGLARDI and BELCONIS arranged and caused the fraudulent deals to be closed at Classic Title, where false and fraudulent documents were signed, including:

a. residential mortgage loan applications, containing materially false representations and omissions of material fact regarding the buyers' intended use of the condos, their employment information and gross monthly income, and other mortgages for which they would be responsible;

b. affidavits of occupancy, falsely representing that the buyers intended to occupy one or more of the condos as a primary residence;

c. mortgages and notes falsely stating that the buyers intended to occupy certain condos as a primary residence and that they would repay the loans; and

d. settlement statements, falsely attesting that the buyers had tendered certain sums of cash toward the purchase of the condos.

36. It was further part of the scheme that MANGLARDI used American Dream to divert, to his wife and to B4V, proceeds of the sale of condos to his daughter. MANGLARDI caused American Dream to issue checks payable to his daughter, which checks were then deposited into the bank accounts of his wife and B4V.

E. *Use of Corporate Entities and Shell Companies*

37. It was further part of the scheme that MANGLARDI, WOJTAS, and their co-schemers used corporate entities and shell companies—namely, American

Dream, ESP 411 Holdings, and Palatine Leasing Services Group—to front down payments to condo buyers, to refund down payments to condo buyers, to make mortgage payments on behalf of condo buyers, and to conceal from mortgage lenders that they (MANGLARDI and WOJTAS) were funding down payments and mortgage payments on behalf of condo buyers.

38.     It was further part of the scheme that MANGLARDI, WOJTAS, and their co-schemers caused closing settlement statements to misrepresent that buyers brought cash to the closings to fund the requisite down payments, when in fact buyers' down payments were being funded with money provided to them and to closing settlement agents by American Dream.

39.     It was further part of the scheme that MANGLARDI, WOJTAS, and their co-schemers caused proceeds of condo sales to be disbursed to American Dream so that American Dream would be fraudulently reimbursed for the down payments that it was fronting and refunding to condo buyers.

40.     It was further part of the scheme that MANGLARDI, WOJTAS, and their co-schemers caused American Dream disbursements to be mischaracterized on closing settlement statements as the payment of "marketing fees," "contract fees," or other fees allegedly owed to American Dream, when in fact, as they knew, the disbursements of sale proceeds did not constitute payment for legitimate fees owed to American Dream, but instead constituted, at least in part, reimbursements for down payments that they improperly fronted and refunded to condo buyers through American Dream.

41. It was further part of the scheme that, in exchange for refunding the down payments of condo buyers, MANGLARDI and WOJTAS required condo buyers to agree to share their equity interests in the condos with MANGLARDI and WOJTAS. At no time did MANGLARDI, WOJTAS, and their co-schemers disclose to mortgage lenders that:

      a. they had induced people to purchase condos based on promises of down payment refunds;

      b. they would be assuming an equity interest in the condos subsequent to the closings, through an entity that they controlled, namely, ESP 411 Holdings, LLC; and

      c. the buyers' equity and ownership interests in the condos would be diminished as a result of their agreements to share their interests with MANGLARDI and WOJTAS.

42. It was further part of the scheme that MANGLARDI, WOJTAS, and their co-schemers caused closing settlement agents to disburse proceeds of condo sales to another entity that they controlled, Palatine Leasing Services Group, Inc., to partially fund their future payments of the buyers' mortgages.

43. It was further part of the scheme that MANGLARDI, WOJTAS, and their co-schemers maintained control over the occupancy of the condos at the Woods, through Palatine Leasing Services Group, and collected rent from tenants and paid condo investors' monthly mortgage payments, assessments, and property taxes for a period of time.

44. It was further of the scheme that MANGLARDI, WOJTAS, and their co-schemers stopped paying the mortgages, assessments, and property taxes, despite guarantees that they had made to induce investors to purchase condos at the Woods.

## Damage Resulting from the Scheme

45. As a result of the fraudulent acts and concealment of material facts by MANGLARDI, WOJTAS, VALI, BELCONIS, GRIECO, GANSER, and their co-schemers:

a. banks and mortgage lending institutions unwittingly funded risky, speculative property investment deals, on unfavorable terms to unqualified borrowers, supported by inadequate collateral;

b. Fannie Mae and Freddie Mac unwittingly purchased many of those non-conforming, toxic loans in the secondary mortgage market;

c. borrowers defaulted on their loans and were unable or unwilling to repay the loans;

d. the unpaid loans could not be fully satisfied by selling the condos securing the loans because the unpaid balances of the mortgages exceeded the market values of the condos;

e. victim lenders, including FDIC-insured financial institutions, incurred losses totaling more than $14,700,000; and

f. Fannie Mae and Freddie Mac incurred losses totaling more than $1,300,000.

## Execution of the Scheme

46.     On or about September 11, 2007, at Rolling Meadows, in the Northern District of Illinois, Eastern Division, and elsewhere,

> VINCE MANGLARDI,
> DAVID W. BELCONIS, and
> KARIN L. GANSER,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate funds transfer in the amount of approximately $156,005 from Fifth Third Mortgage Company to Village Bank & Trust, through the Fedwire Funds Transfer System in New Jersey, which funds represented the proceeds of a mortgage loan to GANSER's daughter for the purchase of 925 N. Sterling Avenue, Unit 107, Palatine, Illinois;

In violation of Title 18, United States Code, Section 1343.

## COUNT TWO
### (Wire Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     Paragraphs 1 through 45 of Count One are incorporated here.

2.     On or about September 11, 2007, at Rolling Meadows, in the Northern District of Illinois, Eastern Division, and elsewhere,

VINCE MANGLARDI and
DAVID W. BELCONIS,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate funds transfer in the amount of approximately $165,820 from Fifth Third Mortgage Company to Village Bank & Trust, through the Fedwire Funds Transfer System in New Jersey, which funds represented the proceeds of a mortgage loan to MANGLARDI's daughter for the purchase of 1270 Sterling Avenue, Unit 217, Palatine, Illinois;

In violation of Title 18, United States Code, Section 1343.

## COUNT THREE
### (Mail Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     Paragraphs 1 through 45 of Count One are incorporated here.

2.     On or about October 25, 2007, at Arlington Heights, in the Northern District of Illinois, Eastern Division, and elsewhere,

VINCE MANGLARDI and
KARIN L. GANSER,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be delivered by FedEx, a commercial interstate carrier, according to the direction thereon, from the offices of Chicago Title Insurance Company in Arlington Heights, Illinois, to the offices of Wells Fargo Bank in Lombard, Illinois, a package containing a signed mortgage and note, along with other closing documents executed at the closing for the sale of 980 Countryside Drive, Unit 111, Palatine, Illinois, to GANSER;

In violation of Title 18, United States Code, Section 1341.

## COUNT FOUR
### (Wire Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.  Paragraphs 1 through 45 of Count One are incorporated here.

2.  On or about November 16, 2007, at Rolling Meadows, in the Northern District of Illinois, Eastern Division, and elsewhere,

> VINCE MANGLARDI,
> DAVID W. BELCONIS,
> NUNZIO L. GRIECO, and
> KARIN L. GANSER,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate funds transfer in the amount of approximately $162,861 from National City Bank of Indiana to Village Bank & Trust, through the Fedwire Funds Transfer System in New Jersey, to fund a mortgage loan to GANSER's daughter for the purchase of 950 N. Countryside Drive, Unit 213, Palatine, Illinois;

In violation of Title 18, United States Code, Section 1343.

## COUNT FIVE
### (Wire Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.      Paragraphs 1 through 45 of Count One are incorporated here.

2.      On or about November 16, 2007, at Rolling Meadows, in the Northern District of Illinois, Eastern Division, and elsewhere,

VINCE MANGLARDI and
DAVID W. BELCONIS,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate funds transfer in the amount of approximately $162,836 from National City Bank of Indiana to Village Bank & Trust, through the Fedwire Funds Transfer System in New Jersey, which funds represented the proceeds of a mortgage loan to MANGLARDI's daughter for the purchase of 915 N. Countryside Drive, Unit 106, Palatine, Illinois;

In violation of Title 18, United States Code, Section 1343.

## COUNT SIX
### (Wire Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.      Paragraphs 1 through 45 of Count One are incorporated here.

2.      On or about November 29, 2007, at Rolling Meadows, in the Northern District of Illinois, Eastern Division, and elsewhere,

> VINCE MANGLARDI,
> DAVID W. BELCONIS, and
> KARIN L. GANSER,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate funds transfer in the amount of approximately $198,780 from Washington Mutual Bank to Village Bank & Trust, through the Fedwire Funds Transfer System in New Jersey, to fund a mortgage loan to GANSER's daughter for the purchase of 935 W. Countryside Drive, Unit 219, Palatine, Illinois;

In violation of Title 18, United States Code, Section 1343.

## COUNT SEVEN
### (Mail Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     Paragraphs 1 through 45 of Count One are incorporated here.

2.     On or about November 29, 2007, at Arlington Heights, in the Northern District of Illinois, Eastern Division, and elsewhere,

THEODORE J. WOJTAS, JR.,
also known as "T.J. Wojtas," and
NUNZIO L. GRIECO,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be deposited, to be sent and delivered by UPS, a commercial interstate carrier, according to the direction thereon, from the offices of Chicago Title Insurance Company in Arlington Heights, Illinois, to the offices of Wells Fargo Home Mortgage in Minneapolis, Minnesota, a package containing a signed mortgage and note, along with other closing documents executed at the closing for the sale of 1065 Sterling Avenue, Unit 204, Palatine, Illinois, to Albert C.;

In violation of Title 18, United States Code, Section 1341.

## COUNT EIGHT
### (Wire Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     Paragraphs 1 through 45 of Count One are incorporated here.

2.     On or about November 30, 2007, at Rolling Meadows, in the Northern District of Illinois, Eastern Division, and elsewhere,

VINCE MANGLARDI and
DAVID W. BELCONIS,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate funds transfer in the amount of approximately $187,484 from Washington Mutual Bank to Village Bank & Trust, through the Fedwire Funds Transfer System in New Jersey, which funds represented the proceeds of a mortgage loan to MANGLARDI's daughter for the purchase of 925 N. Sterling Avenue, Unit 104, Palatine, Illinois;

In violation of Title 18, United States Code, Section 1343.

## COUNT NINE
### (Wire Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     Paragraphs 1 through 45 of Count One are incorporated here.

2.     On or about December 11, 2007, at Rolling Meadows, in the Northern District of Illinois, Eastern Division, and elsewhere,

VINCE MANGLARDI and
NUNZIO L. GRIECO,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate funds transfer in the amount of approximately $181,951 from Wells Fargo Home Mortgage to Village Bank & Trust, through the Fedwire Funds Transfer System in New Jersey, which funds represented the proceeds of a mortgage loan to MANGLARDI's daughter for the purchase of 920 Sterling Avenue, Unit 110, Palatine, Illinois;

In violation of Title 18, United States Code, Section 1343.

## COUNT TEN
### (Mail Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.    Paragraphs 1 through 45 of Count One are incorporated here.

2.    On or about December 28, 2007, at Arlington Heights, in the Northern District of Illinois, Eastern Division, and elsewhere,

> VINCE MANGLARDI,
> DAVID W. BELCONIS,
> NUNZIO L. GRIECO, and
> KARIN L. GANSER,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be deposited, to be sent and delivered by UPS, a commercial interstate carrier, according to the direction thereon, from the offices of Chicago Title Insurance Company in Arlington Heights, Illinois, to the offices of Wells Fargo Home Mortgage in Minneapolis, Minnesota, a package containing a signed mortgage and note, along with other closing documents executed at the closing for the sale of 935 Countryside Drive, Unit 111, Palatine, Illinois, to GANSER;

In violation of Title 18, United States Code, Section 1341.

## COUNT ELEVEN
### (Mail Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     Paragraphs 1 through 45 of Count One are incorporated here.

2.     On or about January 4, 2008, at Arlington Heights, in the Northern District of Illinois, Eastern Division, and elsewhere,

> VINCE MANGLARDI,
> NUNZIO L. GRIECO, and
> KARIN L. GANSER,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be delivered by UPS, a commercial interstate carrier, according to the direction thereon, from the offices of Chicago Title Insurance Company in Arlington Heights, Illinois, to the offices of Fifth Third Mortgage Company in Countryside, Illinois, a package containing a signed mortgage and note, along with other closing documents executed at the closing for the sale of 920 N. Sterling Avenue, Unit 209, Palatine, Illinois, to GANSER;

In violation of Title 18, United States Code, Section 1341.

## COUNT TWELVE
### (Wire Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.    Paragraphs 1 through 45 of Count One are incorporated here.

2.    On or about January 23, 2008, at Rolling Meadows, in the Northern District of Illinois, Eastern Division, and elsewhere,

### VINCE MANGLARDI,

defendant herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate funds transfer in the amount of approximately $169,065 from Countrywide Bank to Village Bank & Trust, through the Fedwire Funds Transfer System in New Jersey, which funds represented the proceeds of a mortgage loan to MANGLARDI's wife for the purchase of 1170 N. Sterling Avenue, Unit 217, Palatine, Illinois;

In violation of Title 18, United States Code, Section 1343.

## COUNT THIRTEEN
### (Wire Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     Paragraphs 1 through 45 of Count One are incorporated here.

2.     On or about January 30, 2008, at Rolling Meadows, in the Northern District of Illinois, Eastern Division, and elsewhere,

VINCE MANGLARDI and
DAVID W. BELCONIS,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate funds transfer in the amount of approximately $142,162 from Countrywide Bank to Village Bank & Trust, through the Fedwire Funds Transfer System in New Jersey, which funds represented the proceeds of a mortgage loan to Tae L. for the purchase of 925 N. Sterling Avenue, Unit 209, Palatine, Illinois;

In violation of Title 18, United States Code, Section 1343.

## COUNT FOURTEEN
### (Mail Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     Paragraphs 1 through 45 of Count One are incorporated here.

2.     On or about February 21, 2008, at Rolling Meadows, in the Northern District of Illinois, Eastern Division, and elsewhere,

VINCE MANGLARDI and
THEODORE J. WOJTAS, JR.,
also known as "T.J. Wojtas,"

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be delivered by a commercial interstate carrier, according to the direction thereon, from Wells Fargo's treasury in Frederick, Maryland, to the offices of Classic Title, LLC, in Rolling Meadows, Illinois, a package containing a cashier's check in the amount of approximately $151,666 payable to Classic Title, representing the proceeds of a Wells Fargo mortgage loan to Marc Z. for the purchase of 1095 N. Sterling Avenue, Unit 115, Palatine, Illinois;

In violation of Title 18, United States Code, Section 1341.

## COUNT FIFTEEN
### (Mail Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     Paragraphs 1 through 45 of Count One are incorporated here.

2.     On or about May 6, 2008, at Arlington Heights, in the Northern District of Illinois, Eastern Division, and elsewhere,

> VINCE MANGLARDI,
> WALTER VALI,
>     also known as "Wally Mohammad"
>     and "Mohammad Valimohammad," and
> NUNZIO L. GRIECO,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be deposited, to be sent and delivered by FedEx, a commercial interstate carrier, according to the direction thereon, from the offices of Chicago Title Insurance Company in Arlington Heights, Illinois, to the offices of Washington Mutual Bank in Jacksonville, Florida, a package containing a signed mortgage and note, along with other closing documents executed at the closing for the sale of 1155 N. Sterling Avenue, Unit 206, Palatine, Illinois, to John C.;

In violation of Title 18, United States Code, Section 1341.

## COUNT SIXTEEN
### (Wire Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.       Paragraphs 1 through 45 of Count One are incorporated here.

2.       On or about May 19, 2008, at Mundelein, in the Northern District of Illinois, Eastern Division, and elsewhere,

THEODORE J. WOJTAS, JR.,
also known as "T.J. Wojtas,"

defendant herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, a condominium purchase and sale agreement for 1095 N. Sterling Avenue, Unit 107, Palatine, Illinois, transmitted electronically from a fax machine in the offices of Sunshine Funding, Inc., in Mundelein, Illinois, to the offices of Flagstar Bank's West Coast Operations Center, Bellevue, Washington, through a Flagstar server in Michigan, in connection with a mortgage loan to MacLean H.;

In violation of Title 18, United States Code, Section 1343.

## COUNT SEVENTEEN
### (Mail Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.      Paragraphs 1 through 45 of Count One are incorporated here.

2.      On or about July 10, 2008, at Arlington Heights, in the Northern District of Illinois, Eastern Division, and elsewhere,

> VINCE MANGLARDI and
> THEODORE J. WOJTAS, JR.,
> also known as "T.J. Wojtas,"

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be deposited, to be sent and delivered by FedEx, a commercial interstate carrier, according to the direction thereon, from the offices of Chicago Title Insurance Company in Arlington Heights, Illinois, to the offices of CitiMortgage, Inc., in O'Fallon, Missouri, a package containing a signed mortgage and note, along with other closing documents executed at the closing for the sale of 1095 N. Sterling Avenue, Unit 205, Palatine, Illinois, to Robert T.;

In violation of Title 18, United States Code, Section 1341.

## COUNT EIGHTEEN
### (Mail Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.    Paragraphs 1 through 45 of Count One are incorporated here.

2.    On or about July 30, 2008, at Arlington Heights, in the Northern District of Illinois, Eastern Division, and elsewhere,

> VINCE MANGLARDI,
> THEODORE J. WOJTAS, JR.,
>    also known as "T.J. Wojtas," and
> DAVID W. BELCONIS,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be deposited, to be sent and delivered by FedEx, a commercial interstate carrier, according to the direction thereon, from the offices of Chicago Title Insurance Company in Arlington Heights, Illinois, to the offices of Wells Fargo Home Mortgage in Minneapolis, Minnesota, a package containing a signed mortgage and note, along with other closing documents executed at the closing for the sale of 935 N. Countryside Drive, Unit 214, Palatine, Illinois, to Mary Jo N. and Robert N.;

In violation of Title 18, United States Code, Section 1341.

## COUNT NINETEEN
### (Mail Fraud)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     Paragraphs 1 through 45 of Count One are incorporated here.

2.     On or about September 10, 2008, at Arlington Heights, in the Northern District of Illinois, Eastern Division, and elsewhere,

> VINCE MANGLARDI,
> THEODORE J. WOJTAS, JR.,
>      also known as "T.J. Wojtas," and
> NUNZIO L. GRIECO,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be deposited, to be sent and delivered by FedEx, a commercial interstate carrier, according to the direction thereon, from the offices of Chicago Title Insurance Company in Arlington Heights, Illinois, to the offices of CitiMortgage, Inc., in O'Fallon, Missouri, a package containing a signed mortgage and note, along with other closing documents executed at the closing for the sale of 925 N. Sterling Avenue, Unit 112, Palatine, Illinois, to Joseph C.;

In violation of Title 18, United States Code, Section 1341.

## COUNT TWENTY
### (False Statement)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     Paragraph 1 of Count One is incorporated here.

2.     On or about November 30, 2007, at Rolling Meadows, in the Northern District of Illinois, Eastern Division, and elsewhere,

### VINCE MANGLARDI,

defendant herein, knowingly caused a false statement to be made to Washington Mutual Bank, an FDIC-insured financial institution, for the purpose of influencing the action of Washington Mutual Bank upon a mortgage loan application.  More specifically, MANGLARDI knowingly caused a false statement to be made on a mortgage loan application submitted to Washington Mutual Bank on behalf of MANGLARDI's daughter in connection with her purchase of 925 N. Sterling Avenue, Unit 104, Palatine, Illinois, which mortgage loan application falsely stated, on page 2, that MANGLARDI's daughter was an employee of Company A, when in fact, as MANGLARDI knew, his daughter was not an employee of Company A;

In violation of Title 18, United States Code, Sections 1014 and 2.

## COUNT TWENTY-ONE
### (False Statement)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.      Paragraph 1 of Count One is incorporated here.

2.      On or about December 28, 2007, at Arlington Heights, in the Northern District of Illinois, Eastern Division, and elsewhere,

### DAVID W. BELCONIS,

defendant herein, knowingly caused a false statement to be made to Wells Fargo Bank, an FDIC-insured financial institution, for the purpose of influencing the action of Wells Fargo Bank upon a mortgage loan application. More specifically, BELCONIS knowingly caused a false statement to be made on a settlement statement submitted to Wells Fargo Home Mortgage, a division of Wells Fargo Bank, in connection with Karin L. Ganser's purchase of 935 Countryside Drive, Unit 111, Palatine, Illinois, which settlement statement falsely stated, on line 303, that Ganser had paid approximately $25,337 in cash at settlement, when in fact, as BELCONIS knew, Ganser had not paid approximately $25,337 in cash at settlement;

In violation of Title 18, United States Code, Sections 1014 and 2.

## COUNT TWENTY-TWO
### (False Statement)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.      Paragraph 1 of Count One is incorporated here.

2.      On or about December 28, 2007, at Arlington Heights, in the Northern District of Illinois, Eastern Division, and elsewhere,

### DAVID W. BELCONIS,

defendant herein, knowingly caused a false statement to be made to Wells Fargo Bank, an FDIC-insured financial institution, for the purpose of influencing the action of Wells Fargo Bank upon a mortgage loan application. More specifically, BELCONIS knowingly caused a false statement to be made on a mortgage loan application submitted to Wells Fargo Home Mortgage, a division of Wells Fargo Bank, on behalf of Karin L. Ganser in connection with her purchase of 935 Countryside Drive, Unit 111, Palatine, Illinois, which loan application falsely stated, on page 1, that the source of Ganser's down payment was "Checking/Savings," when in fact, as BELCONIS knew, the source of Ganser's down payment was not Checking/Savings;

In violation of Title 18, United States Code, Sections 1014 and 2.

## COUNT TWENTY-THREE
### (False Statement)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     Paragraph 1 of Count One is incorporated here.

2.     On or about January 23, 2008, at Rolling Meadows, in the Northern District of Illinois, Eastern Division, and elsewhere,

### VINCE MANGLARDI,

defendant herein, knowingly caused a false statement to be made to Countrywide Bank, an FDIC-insured financial institution, for the purpose of influencing the action of Countrywide Bank upon a mortgage loan application.  More specifically, MANGLARDI knowingly caused a false statement to be made on a settlement statement submitted to Countrywide Bank in connection his wife's purchase of 1170 N. Sterling Avenue, Unit 217, Palatine, Illinois, which settlement statement falsely stated, on line 303, that MANGLARDI's wife had paid approximately $21,983 in cash at settlement, when in fact, as MANGLARDI knew, his wife had not paid approximately $21,983 in cash at settlement;

In violation of Title 18, United States Code, Sections 1014 and 2.

## COUNT TWENTY-FOUR
### (False Statement)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.      Paragraph 1 of Count One is incorporated here.

2.      On or about January 30, 2008, at Rolling Meadows, in the Northern District of Illinois, Eastern Division, and elsewhere,

### DAVID W. BELCONIS,

defendant herein, knowingly caused a false statement to be made to Countrywide Bank, an FDIC-insured financial institution, for the purpose of influencing the action of Countrywide Bank upon a mortgage loan application. More specifically, BELCONIS knowingly caused a false statement to be made on a settlement statement submitted to Countrywide Bank in connection with Tae L.'s purchase of 925 N. Sterling Avenue, Unit 209, Palatine, Illinois, which settlement statement falsely stated, on line 303, that Tae L. had paid approximately $16,043 in cash at settlement, when in fact, as BELCONIS knew, Tae L. had not paid approximately $16,043 in cash at settlement;

In violation of Title 18, United States Code, Sections 1014 and 2.

## COUNT TWENTY-FIVE
### (False Statement)

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     Paragraph 1 of Count One is incorporated here.

2.     On or about April 10, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

NUNZIO L. GRIECO,

defendant herein, knowingly caused a false statement to be made to Washington Mutual Bank, an FDIC-insured financial institution, for the purpose of influencing the action of Washington Mutual Bank upon a mortgage loan application. More specifically, GRIECO knowingly caused a false statement to be made on an appraisal report submitted to Washington Mutual Bank in connection with John C.'s purchase of 1155 N. Sterling Avenue, Unit 206, Palatine, Illinois, which appraisal report falsely stated, on page 1, that 545 condominium units had been sold at the Woods at Countryside, when in fact, as GRIECO knew, 545 condominium units had not been sold at the Woods at Countryside;

In violation of Title 18, United States Code, Sections 1014 and 2.

## FORFEITURE ALLEGATION

The SPECIAL SEPTEMBER 2014 GRAND JURY alleges:

1.     The allegations in Counts One through Twenty-Five are incorporated here for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(2).

2.     As a result of their violations of Title 18, United States Code, Sections 1014, 1341, and 1343, as alleged in Counts One through Twenty-Five,

> VINCE MANGLARDI,
> THEODORE J. WOJTAS, JR.,
>      also known as "T.J. Wojtas," and
> DAVID W. BELCONIS,

defendants herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2), any and all right, title, and interest they may have in any property, real and personal, constituting, and derived from, proceeds they obtained directly and indirectly as the result of such violations.

3.     The interests of MANGLARDI, WOJTAS, and BELCONIS subject to forfeiture pursuant to Title 18, United States Code, Section 982(a)(2), include the sum of $16,000,000.

4.     If any of the forfeitable property described above, as a result of any act or omission by MANGLARDI, WOJTAS, and BELCONIS:

     a.     cannot be located upon the exercise of due diligence;

     b.     has been transferred or sold to, or deposited with, a third party;

     c.     has been placed beyond the jurisdiction of the court;

     d.     has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute assets under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1);

All pursuant to Title 18, United States Code, Section 982(a)(2).


A TRUE BILL:


_____

FOREPERSON


_____

UNITED STATES ATTORNEY

49